I first have the very pleasant opportunity to welcome Judge Chen. This is his first sitting with the Court, although he's known us from within and without for quite a while. We're delighted that you're here and that we have this distinguished assemblage as well to join us in your first sitting with the Court. Let me ask Judge Flinger if he wishes to comment on that. I would very briefly share in welcoming Judge Chen to the Court. I had the privilege of getting to know him when he was solicitor and even the experience of swearing in some of his associates to their job at the solicitor's office. He certainly is an expert in patent law, and through the luck of the draw, no patent cases are on today's agenda. But nevertheless, I have every confidence that his experience and knowledge will help him get through the decisional process today. Thank you. Thank you, Judge Newman, Judge Flinger. Thank you for that very warm welcome. It's my high honor to join you on the bench here, and I look forward to working with you all for many, many years to come. Thank you. Again, welcome. Now we have the pleasure also of an admission this morning. Mr. Burbridge, will you approach the podium? I move the admission of Adam William Burbridge, who is a member of the Bar and Good Standing of the Highest Court of Virginia. I have knowledge of his credentials. I also have knowledge of his capabilities since he has been serving as my law clerk, and I am satisfied that he possesses the necessary qualifications. And thus, again, I move the admission. I invite Judge Chen to decide whether to grant the motion or not. Judge Newman, I also know Mr. Burbridge's character and capabilities, and I move the grant. Thank you. Are there any further comments from the committee? I never disagree with my colleagues, so I join them. Okay, so the motion is made, and granted. Will you approach the clerk for administration of the oath? And I move the right to oath. Do you solemnly swear that you will comport yourself as an attorney and counselor of this court, uprightly in accordance with the law, and that you will support the Constitution of the United States of America? I do. Welcome to the Bar of the United States of America. I do. Thank you. Welcome to the Bar, Mr. Burbridge. We now call the first argued case this morning, Number 13-1158, Fine Furniture, against the United States. Ms. Mallory. May it please the Court, Kristen Maury on behalf of Fine Furniture Shanghai Limited, a fully cooperative, mandatory respondent that dedicated professional and financial resources for over a year in responding to every question posed to it by the Department of Commerce. This case presents the Court with a clear Chevron 1 question involving the meaning of the phrase, that party, in the statute. This is 19 U.S.C. 1677. Is there any question that China was not a party? Are you challenging the category of China as a party in this investigation? Not at all. There is no question China is a party. So it is a party under the law. China is a party, and China is the party that did not cooperate. But the adverse facts were applied to Fine Furniture. Looking at the language of the statute, it says, if Commerce finds that an interested party has failed to cooperate by not acting to the best of its ability, Commerce may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available. And especially when you contrast it. Isn't that what Commerce did? Commerce says that they did many times. They say that they found adverse facts against China, but there's nothing on the record to demonstrate that. In fact, the overwhelming evidence is that the adverse facts were applied against Fine Furniture. They are the party that has had unlawful duties collected on its products since the beginning of this case. They're unlawfully included in this countervailing duty order, despite the fact that they were fully cooperative. And there's also no dispute that Fine Furniture was fully cooperative in every respect. Ms. Mowrey, China is not a mandatory respondent here, but they are a party, correct? In countervailing duty cases, the government is considered a respondent, yes. Okay, but they are defined as an interested party under 1677-9, right? They are, and I think if I may, if we can look at the statute here, if we look at subpart A, I can demonstrate the difference of when an adverse inference is allowed. There's no question that China is a party, and there's no question that Fine Furniture is a party. Right, but to be more specific, they're an interested party. They are an interested party. That's how they're defined, that's how they've been designated in the statute. Absolutely. And so my question is, they've been designated here as having, they are a party with interests in this countervailing duty investigation. And what I want to know is, what are those interests? What are China's interests? I think that the bigger question is what are the adverse effects that it has suffered, and there are none. There can be none, and that is maybe more of a question for the United States, because it's, as I said, it's clear that Fine Furniture has suffered many adverse effects, but not so clear that China has suffered any. Yes, but China here is the non-cooperating party, right? Yes. And so then the whole question is, is it permissible for commerce in making the CBD determination, whether they can use an inference that's adverse to the interests of the non-cooperating party, China? There's no question that that's the case. So then the question really is, what are the interests of China that can be said to have been adversely affected by using the inference? And I think that the answer is none. There are no interests of China that have been adversely affected. There's no impact on China whatsoever. But they have to have some interests, because they've been labeled as an interested party. They are a party with interests, as defined by Congress in the statute. I think that's not exactly the – the bigger issue is that the adverse implications are against Fine Furniture, which is not permitted by the statute. And if you can bear with me for just one second, if you look at Subpart A of the statute, it shows a difference between who the bad actor is. In Subpart A, whether an interested party or any other person fails to cooperate, thus creating a gap in the record, then Commerce is permitted to use facts otherwise available. In fact, it says Commerce shall use facts otherwise available when it's either an interested party or any other person. So contrary to that, with Subsection B, where it specifically says where that party has failed, then Commerce may use adverse inferences against that party that has failed to cooperate. I think trying to extract – let me be candid with you, Ms. Murray. You have a problem that's worth arguing over. But I don't think your problem is solved by trying to construe words in that statute, because what Commerce did is consistent with the plain meaning of the statute. What's not consistent with the plain meaning of the statute is that your client took the punishment. That's the issue, and I don't see anything in the statute that addresses that. So you're raising a very interesting problem, which is should the collateral damage that occurs as a result of our government punishing the Chinese government, which they're entitled to do under our law, should that collateral damage end up in your client's lap? Now, if it happened in this country, we might call it a taking, but that isn't the context in which this case is coming up. So help me understand. First of all, is it not true that China has an interest in the industries, in the Chinese industries? Our government spends a lot of time protecting American industry. In fact, this whole system that you're challenging is designed to protect American industry from foreign competition. Doesn't China have an equal interest in doing that? I don't think that we can speculate what China's interests are. It very well may be the case that China wants to limit the exports of its goods because it wants certain goods to remain within its own country. It's not for us to speculate. What we have is this statute. And I think respectfully, we disagree with the CIP's decision that this is collateral damage. There is nothing about it that is collateral. There is no damage to China. And what they've done in selecting this benchmark, what Commerce did, is they went through and cherry-picked the highest rate possible of all the electricity rates within China and applied that rate to find— Did you challenge that process? Yes, absolutely. We did challenge that process below, at Commerce and at the court below. Well, I know you challenged the principle, but did you challenge the cherry-picking of the highest rates and ask them to pick something else? Yes. What we suggested at the time is either that they— Our first line was that they should not apply any adverse facts to fine furniture whatsoever, that they should look at what fine furniture's experience was, which is the published electricity rates in Shanghai were the rates that fine furniture paid. There's no evidence of preference of what they should have paid and what they did pay. But assuming that an adverse inference is permissible here, then that's how adverse inferences work, right? It would be permissible then to go ahead and select the highest electricity rate. Permissible only against that party that failed to cooperate, which fine furniture did not. But it's predicated on whether or not it was okay to use the adverse inference in this context. If it was, then it's okay to do the methodology that they did do. You'll agree with that, right? I think that your question, Your Honor, goes to the question of what is the gap that Commerce is trying to fill, right? The only reason we're in this section of the statute is if Commerce says that there is a gap in the record. And under Dunan and other cases of this course, that you can only go to student facts available, much less adverse facts available, if there is a gap. The only gap here on this record are these two price proposals that the government of China failed to provide that relate to how the electricity prices are set. How would you suggest that Commerce fill that gap? We have to read a lot into what Commerce did because they don't do a lot of explaining in their decision. But Commerce says that they filled that gap primarily to find that the subsidy was both specific and provided a financial contribution. That's the first line of what they said, the gap that they filled. We don't know what these price proposals were, so we're going to find adversely that this program is specific and that it provided a financial contribution. Let me repeat my question. How would you suggest Commerce go about filling the gap? My suggestion is that there is no gap when you're looking at a benchmark. I don't question their filling the gap of the first two prongs of what a subsidy is. I question whether or not there is a gap when you're looking at what is the appropriate benchmark against which to measure fine furniture. There is a gap in that China didn't cooperate. I think those are two different things. How would you suggest the United States punish China for its non-cooperation under this system? I think it's clear that the United States has said that it's punished China by finding both that this program is specific and that it provides a financial contribution. They went yet another step further inappropriately to say now when we're going to measure the individual impact on fine furniture, we are going to find the highest rate in Zhejiang province where fine furniture is not located for one portion of its electricity bill. For another portion of the electricity bill, we're going to Guizhou province and find the highest rate there. I think when you look at what this court has done under Gallon Ocean and BestPak, you said even where something is reasonably adverse facts, where it's legitimately adverse facts, there still must be a relation to commercial reality. There's no question that fine furniture located in Shanghai would be unable to obtain electricity from either of those two provinces. I take it you're not in favor of declaring war. I am not in favor of declaring war. I'm in favor of free and fair trade and the rule of law, which when you look at the statute can be upheld here. I'd like to reserve the rest of my time. Just a quick question. Sure. Did you make the Gallon argument below to Commerce or the CIT? I didn't read your blue brief that's going into all these details about picking from different provinces, different parts of the ultimate calculation. We definitely did. The cherry-picking argument we did make, I'm not sure that we made clearly the connection with Gallon Ocean, but given the recent reinforcement of Gallon in the BestPak decision, I think it just shows how much more egregious it is in this case where you have a fully cooperative respondent. In Gallon and BestPak where there's an AFA, a legitimate AFA, you owe them the benefit of commercial reality. But here, where you have a fully cooperative respondent, you don't. It's simply unfair. One other thing to point out is when Commerce says what they have intended to do, they try to say we didn't intend to apply AFA to fine furniture. But what they did, when you look at what they applied against the actual non-cooperative respondents, the 124 companies that did not respond to the questionnaire, they used the rate calculated for fine furniture and the AFA rate for those non-cooperative respondents. So it's a little bit tricky to decide what Commerce is thinking when they do or don't. We can't just rely on what they were thinking when they used these calculations. It's clear that they used fine furniture's AFA rate for electricity for the actual non-cooperative respondents. All right. Let's hear from the government. Mr. Shradlow. Good morning, Your Honor. May it please the Court. The trial court correctly recognized that Commerce applied AFA against the government of China, not against fine furniture, and the record supports that conclusion. That's only theoretical. Does the government not recognize the unfairness of hitting fine furniture for something that China did or didn't do just because you can do it? They didn't do anything wrong. They did everything right. They fully cooperated. Do I have that correct? Absolutely, Your Honor. So why are they being punished for something a third party, in this case China, the government of China, why are they being punished for something they couldn't control? Well, as an initial matter, I think this Court has repeatedly recognized that AFA is not a punishment. It's a means of encouraging cooperation. But more importantly to your question, the statute doesn't presume. It creates a regime in which, in some cases, cooperating parties bear the collateral effects of an adverse inference. For example, in KYD, the issue in KYD was whether a cooperating importer could be required to pay the margin, an AFA margin, of a non-cooperating exporter. And this Court held that even though the importer cooperated under the statutory scheme that exists, it was permissible to have that kind of collateral effect on the importer under the theory, among other things, that that's sort of the only way to get to the exporter. That's the only way to encourage cooperation. The Court asked my colleague, asked the opposing counsel, what are China's interests? And I think China's interests are that it's interested in its industries. It's interested in its industries, particularly when we see that apparently there's at least the suggestion here, an allegation that they subsidize those industries, so they're interested in their success, and the government of China participated in commerce's investigation. I gather the government of China cooperated almost completely. The only thing I gather they did not provide you with was a table of information about what all the various provinces charged for their electric. Maybe they don't have that information. Well, that's not exactly correct, Your Honor. Enlighten me. The government of China provided the various numbers, the various rates for the provinces. What they didn't provide commerce is any information about how those rates were set. And given that this program is being investigated as a potential government subsidy, the only way that commerce could know whether this really is a subsidy, whether it meets the requirements of an account-available subsidy, the three-prong requirements of contribution, specificity, and benefit, was to actually look at the working papers and figure out, is this a program that provides financial contribution? Is it specific to a particular industry? And does it provide a benefit? What if that information was available to each of the provinces did their own thing, I take it? What if that information was not available in a usable or repeatable form to the government of China? Then what do we do? Well, in that case, the government of China was required to explain in detail why it couldn't provide that information. And as commerce explained in its IMD memorandum, the Issues and Decisions Memorandum, the government of China failed to do that to commerce's satisfaction. In other words, they said, we can't provide you these, and they didn't go into sufficient detail as to why that really is. And I will note that no one has really challenged the fact that the government of China didn't cooperate in this proceeding. That's conceded on all sides. So the question is, commerce is left with a gap in the record. It doesn't know whether this program is a subsidy. It doesn't know whether it meets the three prongs. And the only tool that commerce has, not only to fill the gap, but also to encourage cooperation, is this perhaps imperfect tool of using AFA in the hopes that the government of China, being interested in its industries, will be encouraged to cooperate in the future. I take it that your view that in KYD this court has already held that it's possible, depending on the circumstances, to be able to use an adverse inference against a non-cooperative party that ultimately has a downstream negative impact on a cooperating party. That is exactly our position, Your Honor. But what about Changzhou, the other federal circuit opinion, which there seems to be some tension there. I don't think there's quite as much tension as there may appear at first glance. In Changzhou, the situation was different. In Changzhou, commerce did not— the issue in Changzhou was whether an entity that was eligible for a separate rate could receive the rate of a non-cooperating mandatory respondent when it was undisputed that the mandatory respondent, in fact, wouldn't be affected by that rate at all. So what commerce did was it basically calculated a hypothetical AFA rate, rather than investigating the respondent, the appellant in Changzhou. Cut to the chase. What do you think is the thread that reconciles those two opinions? What's the principle to take away? I think the principle is that when commerce has some sort of ability to create a rate, to figure out what the rate is without using AFA, then it should try to do so. In this case, it didn't have that tool, and the trial court correctly recognized that it didn't. In fact, the trial court correctly recognized there's no— for example, there's no neutral benchmark. What fine furniture has termed a neutral benchmark isn't a neutral benchmark at all. Isn't there another principle there that you could say that when it comes to the non-cooperating party with the cooperating party, you have to look at the relative alignment of interests between those two parties to figure out whether it's permissible to use the AFA in making the CBD determination. In KYD, there was an alignment of interest between that importer and exporter. But in Changzhou, it was just a bunch of unaffiliated private companies where you couldn't say there was any alignment of interest. So how could there be any inducement to cooperate for the non-cooperating private parties in that instance? I think that is certainly a reading that we would agree with, but I would note that under that reading, this case, again, falls on the KYD side because the idea is that China is, as defined by the statute, the government of China is defined as an interested party, and we— But we don't know what those interests are, so we can't measure whether or not doing the inference here is adverse to those interests because those interests have not yet been expressed or identified. I didn't see anything in Commerce's determination or in the CIT's opinion which identified what are China's interests here at stake that you could say the inference that's being raised here in making this determination was adverse to the interests of that non-cooperating party. Your Honor, I think the record actually indicates that the government of China does have an interest in its industries. It's not just speculation. And the reason we know that is because the government of China not only participated in Commerce's investigation, but it affirmatively objected to the investigation of the electricity program and repeatedly said that this program should not be investigated. So the government of China had some sort of interest in this program not being investigated. And the other point is, I think that— there has to be some kind of analysis or finding, doesn't there, that in fact the inference being used is against the interests of China. And I don't think I saw any analysis on that score here before you can pass go and then go ahead and start applying that inference in making the determination which ultimately has this adverse effect on fine furniture. Your Honor, I think that—I don't think that that finding needs to be expressly made. And in support, I would once again cite KYD. I mean, in KYD, we presume that the relationship between the importer and the exporter is what gives rise to essentially sufficient connection so that you can use essentially the transitive property of the adverse inference. I think that's exactly the same as we have here. Just as the interests weren't perfectly aligned in KYD, the importer could go and work with another exporter if it wanted to. But there was some relationship there, and this court found that that relationship wasn't enough. So here, we also have an industry that is being allegedly subsidized by the government of China. The government of China has some interest in this investigation. It has staked a position as to what it believes commerce should and should not do. And that position happens to align with the position of fine furniture. Mr. Sverdlo, let's follow up on that colloquy with a further question, if I may. Do you disagree with the following proposition? We find no support in our case law or the statute's plain text for the proposition that deterrence rather than fairness or accuracy is the overriding purpose of the anti-dumping statute when calculating a rate for a cooperating party. Quite the contrary. Applying an adverse rate to cooperating respondents undercuts the cooperation-promoting goal of the AFA statute. Do you disagree with that? Of course not, Your Honor. As I recollect, that's the building from Cheng's little building. Yes, it is indeed. Our most recent case on this issue. I don't think the... That's the policy of the government, at least as established by this court. It seems to me that ends the case, doesn't it? Not at all, Your Honor, because in Cheng Xu, the only issue, as this court identified, and this court specifically noted that the narrow issue in Cheng Xu was whether commerce could calculate this hypothetical rate where deterrence was the only justification that commerce gave. As we explained extensively below and as we explained in our brief here, AFA was necessary to investigate this program because we had no other way of filling the gap in the record. When it comes to the first two prongs of the analysis of whether a program is countervailable, contribution and benefit, it's a binary determination. Either a program is a contribution or it's not. Either it is specific to an industry or it's not. So in that sense, you really only can either do AFA... But if you could cherry-pick the highest points, you could also have used averages or some other data point. That might have been a little fairer to your cooperating party. Why don't you do that? I don't think it would have been fair at all because, as the trial court correctly recognized, when we're looking at these prices, we don't know what they are. The reason that commerce picked the highest one is not because it wanted to punish anyone. It picked the highest benchmark because that's the price that's least likely to be tainted by subsidies. When we don't know what the benchmark is, it's undisputed that we can't look at the electricity price in China because it's a non-market price for a benchmark. We can't go outside of China for a world market price because there is no world market price for electricity. For China's electricity. For China's electricity, precisely. The only thing we have under commerce's regulations, CFR 351.511, the last prong is we have to analyze the prices that are in China to determine whether they were set in accordance with market principles. That's exactly what we couldn't do. We didn't have the provincial price proposals. We didn't know. I will also note... Are you concerned at all about the adverse effect of picking on a cooperating party so that in the future there's no advantage to parties like Fine Furniture to cooperate? I think it's unfortunate, but I think that's the regime that the statute sets up. And I will also note that in this case, once again, we don't have a neutral benchmark. It's not like we had various prices that we could have picked and we just picked the highest one. We had a good reason for picking the highest one. It's the one that's least likely to be tainted by subsidies. As the trial court correctly noted... Or most likely to be tainted. Least likely to be tainted by subsidies. The highest one? Because the way the calculation of benefit works is we take the benchmark price and we subtract the price that Fine Furniture paid from the benchmark. That's the amount of benefit. So the higher the price for electricity, that's least likely to represent a price that's been tainted by subsidies. So Fine Furniture paid the lower price than what we think is the benchmark, essentially what a market rate would be. Then that's the price that represents the subsidy. Inverted. When you have multiple parties involved in trying to make a determination like this, and you have some that are cooperating and some that are non-cooperating, what does commerce do? Does commerce automatically use an adverse inference once there's a non-cooperating party? Or is there some kind of judgment that takes place? Like, for example, in this one, we can see that the brunt of the adverse inference is going to fall upon Fine Furniture. And I guess what I'm wondering is to what extent does commerce make an analysis of the adverse inference and its effects on the interests of the non-cooperating party? Or does it just presume that if there's a non-cooperating party, we go straight to an adverse inference? Your Honor, if a party is non-cooperating, we go to an adverse inference if it's necessary to fill a gap. That's what the statute requires. And consistent with this court's precedent, we look to see that the adverse rate and the adverse inference that generates that rate is connected to commercial reality, albeit with some additional built-in margin for deterrence. But it's a case-specific determination, so I think it's hard for me to say right now what we would have done if we had entities that didn't cooperate. I will just note that in this case, if Fine Furniture were being compared to an entity that didn't cooperate, I don't think that would change very much because, again, we didn't apply adverse inferences in this case against Fine Furniture. We applied them against the government of China. How? By finding that the program that the government of China didn't want us to investigate and objected to us investigating and believed that its industries should benefit from without commerce being able to look inside the program, by finding that that program did provide a benefit, and we presume that the government of China is interested in having its industries, that it allegedly subsidizes, and having its industries succeed and presumably have lower margins. And that's all we can do. At the end of the day, this AFA tool, in the context of countervailing duties, it's imperfect. But it's the only thing we have. Commerce doesn't have subpoena power. It doesn't have any way to get information from governments that it needs to investigate these programs because it's the governments that control this information. The only tool we have is AFA. It's imperfect, but that's all there is. Any more questions? No further questions. Thank you. Thank you, Your Honor. Thank you. I'd like to pick up on something that my colleague just said about not applying AFA's inferences to find furniture, and I'll direct your attention to the Issues and Decision Memo. This is at JA100503, where Commerce says, As explained above, we have continued to apply an adverse inference within the selection of the benchmark. Thus, we are seeking the highest rates applicable to a company with fine furniture as user characteristics. I don't know how that can be construed as anything other than applying an adverse inference against fine furniture. Judge Chan, if I can follow up on one of your questions relating to whether or not there's an alignment of interest between the parties. First, this is a case of first impression, so unlike the other cases that I've seen before, we've not had one where there's a fully cooperative, mandatory respondent. KYD is different because it was an importer. That's always going to be derivative of what the exporter gets. But the issue of alignment of interest, as in Chengzhou-Wujin, is so evident here, where you have in the companion anti-dumping case, fine furniture had to answer multiple questions to the Department of Commerce to prove its independence from the government of China, to get that separate rate status, yet somehow, magically, in this companion countervailing duty case, fine furniture is now seen to have some control over what China is or is not doing. There is no alignment of interest in this case. Well, yeah, it's not about whether fine furniture is controlling the government of China. It's just a question of whether or not the interests of China are aligned with the interests of your client to the extent that, I don't know, maybe China wants to promote an export economy because that's good for its overall economic welfare. And likewise, to that end, they want to promote a lot of sales abroad, regardless of whether there's a subsidy program. And then, likewise, they also are very interested in making sure that its domestic companies are not subjected to some inaccurate, unfair, countervailing duty in other nations, including the United States. And the United States government has obviously an interest here, as Judge Plager pointed out. This whole statutory regime is designed to ensure that domestic companies here in this country don't have to compete unfairly against merchandise being imported that's being subsidized by some foreign government. So there are interests there. I'm just trying to figure out to what extent doing this adverse inference is, in fact, adverse to the interests of China. I've got two answers to that question. The first, what I meant by the fact that they're not controlling is the idea that they are suffering the adverse effects. The implication of that is that somehow fine furniture with the non-cooperative party. That was my point about that. The other issue of whether or not their interests are aligned, there's nothing to show that they are. And as I said earlier, we can't speculate as to what the interests of China are. Judge Plager, if I can return to one of your issues. I think it's very important to remember that there is a neutral benchmark available here. There is no gap on the record for all of the available electricity rates throughout the entire country. And Fine Furniture proposed an average of the rates for the user category that it exists in. And that average would still yield a subsidy margin, but it would be low enough that Fine Furniture would go below the de minimis level and would be excluded from the CBD order. That is why this issue is such a paramount importance. But all those rates, it's kind of out of context, right? Without knowing whether there's any kinds of subsidies going on by the government of China. In a sense, we're in a black box. We can't tell. And for all we know, the highest rate that Commerce ultimately selected was, in fact, the least subsidized rate of them all. We just don't know, right? What Commerce has done is repeatedly say that they found it to be specific to an industry. And there's nothing in the selection of a benchmark from different regions to show that there's a specific subsidy being provided to the flooring industry. By contrast, what they're really doing is saying, well, maybe it's a regional subsidy, but they've never made that claim. And so there's no rhyme or reason into their selection of the benchmark other than to punish. I guess I'm wondering, is there any rhyme or reason in selecting a bunch of electricity rates that are known, where we have no idea to what extent there's any kind of subsidy that's infiltrating all of the rates? And I think that where there is information on the record and you have a cooperative party, Commerce may not take an adverse inference in applying, you know, in doing this particular benefit calculation for fine furniture. And there's nothing to keep them from using that adverse inference when calculating the electricity benefit for the non-cooperative parties. If they want to still measure the electricity program for the 124 companies that completely blew off Commerce, they can go at it. But with respect to a fully cooperative, mandatory respondent, they may not. I take it you're really raising two different legal theories, even though you don't quite spell them out that way. You're arguing on one side that they can't use AFA at all against your company. But it seems to me you're making a second argument, which is it's a violation of the Administrative Procedure Act for them to arbitrarily pick the highest rate when there were other options they could have used for determining the benchmark. I think both of those are applicable. Either one of those interpretations is correct. There's nothing fair or accurate about what they did in this case from my point of view. But if the AFA is permissible in this case, then picking the highest rate is okay. Is that right? There's nothing blocking them if the AFA rate, if it's permissible to use the AFA. I don't see a way in which the AFA is permissible. That's how the AFA works, isn't it? Well, Wayne, you didn't answer his question because it's an important question. If we should determine that the use of the AFA is proper, then there's no challenge to how they determined it. If Fine Furniture were the party that were uncooperative, there would be no question that the highest rate would be the right one. But it's not the facts. Stay with the facts. How do you answer his question, Judge Chen's question? I don't believe that the highest rate would still be... Even if the AFA is appropriate for the government of China, I don't think the highest rate that applies to Fine Furniture is appropriate. It is as to the 124 other respondents that did not respond. That's fine. How much money is on the line here? Just curious. Because I understand that the AFA part of your 1.5% is 0.6? 0.7. So reducing it would bring us below 1%, which would make Fine Furniture de minimis and therefore excluded from the order. That's fine, but how much money is on the line? It's about $650,000 a year, not to mention the cost of going through... For your company alone? Yes. The 0.6% is or the 1.5? The 1.5. So 0.6 is... But once you're at 0.6, then you're excluded from the order and no duties are owed and you don't have to go through years, if not decades, of administrative reviews proving the same thing over and over again. It's a case of do or die for this company. You're sort of the stalking horse for this whole list of companies? No. We have... I'm not sure I understand your question. Those companies, if Fine Furniture goes below de minimis, then Commerce will have to recalculate the separate rate, so most of those companies there may come before you afterwards to argue about how the separate rate should be calculated. But once Fine Furniture does go below de minimis and is excluded from the order, then the other cooperative... Not separate rate, I'm sorry. What's called the all-others rate in a countervailing duty case. For those cooperative respondents, then Commerce would need to determine a new rate for them. I'm sorry, just one more time. You did not cite or discuss our KYB case in either of your briefs. Just in 15 seconds, why doesn't that counsel the other way? Because that was an example where an adverse inference triggered by a non-cooperating party was ultimately downstream impacting a cooperating party. Sure. And the difference there is that in KYB, an importer will never be a mandatory respondent. There's never anything required of an importer. It's the exporter that's the mandatory respondent. And so in that case, it was an importer trying to fill in extra information on the record, but just because they were cooperative in terms of voluntarily giving information is different from being required by the U.S. government to do something and doing it again and again and again throughout an entire proceeding and still being punished. Does that answer your question? Any more questions? No, thank you. Any more questions? No, thank you. Thank you, Your Honor. Thank you, Ms. Farrell. The case is taken under submission.